**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| SUNRISE RENTALS ENTERPRISES, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No. 1:10-cv-00261-WS-M |
| BP, PLC, et al., | ) ) | |
| Defendants. | ) | |

**HALLIBURTON ENERGY SERVICES, INC.'S REPLY IN SUPPORT OF**
**ITS MOTION TO DISMISS AND, ALTERNATIVELY,**
**FOR A MORE DEFINITE STATEMENT**

Defendant, Halliburton Energy Services, Inc. ("HESI"), respectfully files this Reply in response to Plaintiffs' Opposition to HESI's Motion to Dismiss or For More Definite Statement ("Opposition").

## I.    INTRODUCTION AND SUMMARY

The Deepwater Horizon incident, and Plaintiffs' claims allegedly resulting therefrom, are intensely maritime in nature.  At its heart, this case is about a "vessel" that caught fire, exploded and sank, and the oil spill that resulted from that incident.  The incident occurred, as Plaintiffs concede, well beyond any state's territorial waters in the deep water of the Gulf of Mexico.[1] Plaintiffs' asserted damages, namely loss of income from their business operations as a rental property owner and a real estate management company, allegedly arise from the oil spill in the Gulf of Mexico.  (Complaint ¶¶ 5-6).

---

[1] Complaint ¶ 2

The thrust of Plaintiffs' Opposition is that a key determination in this case—whether Plaintiffs' claims arise under the Court's admiralty jurisdiction—is too fact intensive to be decided at this stage of litigation.  That contention is specious.  Indeed, it runs counter to the guidance of the United States Supreme Court's controlling decisions.  Plaintiffs' claims clearly arise under the Court's admiralty jurisdiction and, therefore, maritime law applies, not state law. Further, while Plaintiffs' claims may arise under the Outer Continental Shelf Lands Act ("OCSLA"), by virtue of its broad grant of federal jurisdiction, *see* 43 U.S.C. §§ 1333(a)(1), 1349(b)(1), maritime law still governs their claims, as OCSLA's narrower "adjacent state law" provision, *see* 43 U.S.C. § 1333(a)(2)(A), does not apply.

Plaintiffs' maritime claims are preempted by the Oil Pollution Act ("OPA") of 1990, 33 U.S.C. §§ 2701, *et seq.,* not because OPA preempts *all* maritime claims, but because OPA preempts maritime claims seeking damages of the type alleged by Plaintiffs.

While Plaintiffs may be able to recover economic damages under OPA, the economic loss rule established in *Robins Dry Dock* precludes their recovery of such damages under maritime law.

Finally, Plaintiffs' claims should be dismissed for their utter failure to meet the applicable pleading requirements of Rule 8.

## II.      ARGUMENTS AND AUTHORITY

**A.     Plaintiffs' Claims, if Any, Arise Under the Court's Admiralty Jurisdiction.**

A critical issue in this litigation is whether Plaintiffs' claims, if any, arise under the Court's admiralty jurisdiction.  Plaintiffs' claims cannot arise under both state law and admiralty

law, as admiralty jurisdiction normally ousts state law from its own application.[2]  Plaintiffs maintain that this critical jurisdictional/choice of law determination cannot be decided at this stage of litigation.  However, their argument runs afoul of the Supreme Court's decision in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995), which provides the Court with the proper analytical framework to make this determination.  Pursuant to *Grubart*, Plaintiffs' claims clearly arise under the Court's admiralty jurisdiction.  Thus, Plaintiffs' claims are governed by maritime law, not state law.

In *Grubart*, the Supreme Court reiterated the current test for admiralty tort jurisdiction, stating that "a party seeking to invoke federal admiralty jurisdiction . . . over a tort claim must satisfy conditions of both [i] location and of [ii] connection with maritime activity."  513 U.S. at 534.[3]  To satisfy the location test, the Court must determine only "whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water."  *Id.*  The Deepwater Horizon clearly was a "vessel" on navigable water.[4]

---

[2] *See Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249, 255 (1972) ("With admiralty jurisdiction comes the application of substantive admiralty law.")

[3] Arguing that it is too complicated to determine at this stage of the litigation whether a sufficient maritime nexus exists, Plaintiffs cite *Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co.,* 644 F.2d 1132, 1135 (5th Cir. 1981).  *See generally,* Opposition at 16-19.  *Sohyde* and its progeny determined admiralty jurisdiction on the basis of a four-factor test first adopted by the Fifth Circuit in *Kelly v. Smith*, 485 F.2d 520, 525 (5th Cir. 1973).  This test required courts to consider factually intensive factors such as:  "(i) [t]he functions and roles of the parties; (ii) the types of vehicles and instrumentalities involved; (iii) the causation and type of injury; and (iv) traditional concepts of the role of admiralty law."  *Kelly*, 485 F.2d at 525.  *Sohyde*, however, has subsequently been limited to its unique facts, *see Broughton Offshore Drilling, Inc., v. South Central Machine, Inc.*, 911 F.2d 1050, 1053 (5th Cir. 1990) (declining to extend *Sohyde* "beyond its factual setting"), which facts include a blowout incident in a canal slip approximately eight feet deep within the State of Louisiana, 644 F.2d at 1134, and alleged damages to property "indistinguishable from those arising from land-based blow-outs[,]" *id.* at 1138.  Importantly for present purposes, the fact-intensive inquires set forth in *Kelly* and its progeny were specifically abrogated by the U.S. Supreme Court in *Grubart*.  *See infra* at 5 and note 9.

[4] The Deepwater Horizon plainly was a vessel, as defined in 1 U.S.C. §3 (defining "vessel" as " every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water"); *see also Stewart v. Dutra*, 543 U.S. 481, 490 (2005) (standardizing the meaning of the word "vessel" as that supplied in 1 U.S.C. § 3 and noting that "[s]ection 3 merely codified the meaning that the term "vessel" had acquired in general maritime law").  *See also* HESI's Memorandum in Support of its Motion to Dismiss at 7-9.

With respect to the "connection with maritime activity" test, the Supreme Court in *Grubart* explained that the test raises two "*Sisson* inquiries."[5]  Under the first *Sisson* inquiry, the Court must "assess the general features of the type of incident involved . . . to determine whether the incident has a potentially disruptive impact on maritime commerce."  *Id.* (quotations and citations omitted).  The Court in *Grubart* stressed that this inquiry focuses "*not on the specific facts* at hand but on whether the '*general features*' of the incident were 'likely to disrupt commercial activity.'"  *Id.* at 538 (citing *Sisson v. Ruby*, 497 U.S. 358, 363 (1990)) (emphasis added).  The *Grubart* Court found that the general features of that case—namely "damage by a vessel in navigable water to an underwater structure"—plainly constituted "the kind of incident that has a potentially disruptive impact on maritime commerce."  *Id.*  (citations omitted).

The facts alleged by Plaintiffs are potentially disruptive of commercial maritime activity.  Plaintiffs allege, among other things, that defendants were negligent with respect to their operation of and activities aboard the vessel, the Deepwater Horizon,[6] and allege damages predominantly to the Gulf of Mexico,[7] a body of water "teeming with maritime activity."[8]  This *Sisson* prong of the maritime nexus inquiry is satisfied.

Under the second *Sisson* inquiry, the Court must "determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity."  *Id.* (quotations and citations omitted).  Importantly, the Supreme Court's directive is directly contrary to Plaintiffs' argument that the Court must gather more facts to

---

[5] "*Sisson* inquiries" refer to inquiries developed by the Supreme Court in the case of *Sisson v. Ruby*, 497 U.S. 358 (1990), which also dealt with the issue of whether claims arose under federal admiralty jurisdiction.  The Supreme Court in *Grubart* advanced the analysis further, but retained the *Sisson* inquiries as part of the admiralty jurisdiction analysis.  *See Grubart*, 513 U.S. at 533-34.

[6] *See, e.g.,* Complaint ¶ 30(a)-(f), (i), (m), (o)-(p), (r).

[7] *Id.* ¶ 2 (alleging that the oil spill "has caused detrimental affects [*sic*] upon the Gulf of Mexico's and Alabama's marine environments").

[8] *Broughton,* 911 F.2d at 1053.

determine whether admiralty jurisdiction applies.  Deciding in favor of using the *Sisson* inquiries (which seek to characterize the *general nature* of an incident to determine admiralty jurisdiction), the Supreme Court expressly abrogated more fact-intensive 4- and 7-factor "maritime nexus" tests applied by the Fifth Circuit,[9] stating that use of such tests "would be hard to apply, jettisoning relative predictability for the open-ended rough-and-tumble of factors, inviting complex argument in a trial court and virtually inevitable appeals." *Id.* at 547.  Thus, the appropriate analysis focuses on the general nature of the incident and does not require greater factual development.

For example, in *Grubart,* the Supreme Court described the general character of the activity as "repair or maintenance work on a navigable waterway performed from a vessel." *Id.* at 540.  The Court further noted that "[n]avigation of boats in navigable waters clearly falls within the substantial [maritime] relationship[.]" *Id.*  Likewise, here, the general character of the defendants' activities could be described as *oil and gas drilling on a navigable waterway performed from a vessel*.  Clearly, the general character of the Deepwater Horizon incident shows a substantial relationship to general maritime activity.[10]

In determining whether admiralty jurisdiction applies, the general nature of the Deepwater Horizon incident controls.  Moreover, even if some defendants were engaged in traditionally maritime activities and some were not, the "substantial relationship to maritime activity" test is satisfied "when at least one alleged tortfeasor was engag[ed] in activity substantially related to traditional maritime activity and such activity is claimed to have been a

---

[9] *Grubart*, 513 U.S. at 544 (addressing the factually intensive 4-factor test announced in *Kelly v. Smith*, 485 F.2d 520, 525 (5th Cir. 1972), and the 7-factor test set forth in *Molett v. Penrod Drilling Co.*, 826 F.2d 1419, 1426 (5th Cir. 1973)).

[10] *See also* Defendant HESI's Memorandum in Support of Its Motion to Dismiss at 10 (citing prior case law finding that oil and gas drilling has a substantial relationship to general maritime activity).

proximate cause of the incident." *Grubart,* 513 U.S. at 541.  Here, defendants include the BP entities, which Plaintiffs allege "manned, possessed, managed, controlled, chartered, and/or *operated* the Deepwater Horizon[.]"  (Complaint ¶ 11).  Plaintiffs further assert that defendants "fail[ed] to properly operate the Deepwater Horizon; [o]perat[ed] the Deepwater Horizon in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill; fail[ed] to timely bring the oil release under control; [and] operat[ed] the Deepwater Horizon with untrained and/or unlicensed personnel[.]"  (Complaint ¶ 30).  Thus, on the basis of Plaintiffs' pleadings, at least one alleged tortfeasor was engaged in traditional maritime activity—operating a vessel in navigable waters—and such activity is claimed to have been a proximate cause of the incident.  Thus, admiralty law applies to Plaintiffs' claims.

    The admiralty jurisdiction test set forth in *Grubart* is not affected by the nature of the Plaintiffs—land-based claimants—or their alleged damages.  First, Plaintiffs' alleged damages—predicated on allegations of harm to the Gulf of Mexico—are themselves intensely maritime.  Second, even assuming Plaintiffs have alleged direct injury to personal or real property, admiralty jurisdiction over their claims would still apply maritime law in lieu of substantive state law by virtue of the Admiralty Extension Act, 46 U.S.C. § 30101.[11]  As the Supreme Court has explained, "[t]he purpose of the [Admiralty Extension Act] was to end concern over the sometimes confusing line between land and water, by investing admiralty with jurisdiction over 'all cases' where the injury was caused by a ship or other vessel on navigable water, even if such injury occurred on land." *Grubart*, 513 U.S. at 532.

---

[11] The Admiralty Extension Act, which used to be codified at 46 U.S.C. § 740, has now been recodified at 46 U.S.C. § 30101.

Admiralty jurisdiction clearly attaches of its own force to any claims Plaintiffs may have arising out of the Deepwater Horizon incident.  Such claims are fundamentally maritime in nature and, therefore, arise under maritime law to the exclusion of state law.[12]

**B.    The Outer Continental Shelf Lands Act Does Not Apply "Adjacent State Law" to Plaintiffs' Claims.**

The only other basis on which state law could apply to Plaintiffs' claims is the "adjacent state law" provision of OCSLA, which applies, as a proxy for federal law, the law of the adjacent state *in certain situations* on the Outer Continental Shelf.  *See* 43 U.S.C. § 1333(a)(2)(A).  The "adjacent state law" provision of OCSLA does not apply in this case because the Deepwater Horizon was neither an "artificial island" nor a "fixed structure" erected on the subsoil or seabed of the Outer Continental Shelf.

As a threshold matter, if maritime law applies to Plaintiffs' claims (and it does, *see supra*, Section A), OCSLA's adjacent state law provision does not apply.[13]  That salient point is reinforced by the statutory text of OCSLA, which contains two relevant but significantly different statutory provisions—Section 1333(a)(1) and 1333(a)(2)(A).

Section 1333(a)(1) of OCSLA contains a very broad exertion of federal control and authority over virtually all activities occurring on the Outer Continental Shelf involving the exploration, development, production and transportation of resources.  That exertion of federal control is extended to "the subsoil and seabed of the outer Continental Shelf and to all artificial islands, *and all installations and other devices permanently or temporarily attached to the*

---

[12] Plaintiffs cite *Brockington v. Certified Electric, Inc.*, 903 F. 2d 1523 (11th Cir. 1990) for the proposition that the Court could apply state law even if it finds that admiralty jurisdiction applies.  In *Brockington*, however, in stark contrast to this case, the Eleventh Circuit found that the interest in applying maritime law was insignificant and that "the action was peculiarly 'local.'"  903 F.2d at 1532.

[13] *See* Opposition at 16-17 (stating that OCSLA borrows adjacent state law as surrogate federal law if "federal maritime law does not apply of its own force").  *See also* HESI's Memorandum in Support of Its Motion to Dismiss at 6-10 (explaining that, pursuant to OCSLA, adjacent state law does not apply to claims where federal maritime law applies of its own force).

*seabed*[.]" 43 U.S.C. § 1333(a)(1) (emphasis added).  The Deepwater Horizon, a *vessel*, fairly falls within the language of a "device . . . temporarily attached to the seabed[.]" Thus, the vessel and its operations were subject to federal control and authority, rendering the regulations promulgated pursuant to OCSLA applicable insofar as they governed Mobile Offshore Drilling Units (MODUs), like the Deepwater Horizon, engaged in drilling operations on the OCS.

In stark contrast, § 1333(a)(2)(A) of OCSLA separately applies the "laws of each adjacent state" on the Outer Continental Shelf in a much narrower set of circumstances.  That provision provides, in relevant part, that the law of the adjacent state applies "to that portion of the subsoil and seabed of the outer Continental Shelf, and *artificial islands* and *fixed structures* erected thereon[.]" (emphasis added).  Conspicuously absent is the language contained in § 1333(a)(1) pertaining to "all installations and other devices permanently or temporarily attached to the seabed."  Rather, § 1333(a)(2)(A) has a narrower reach, applying adjacent state law to "artificial islands" and "fixed structures," not to vessels like the Deepwater Horizon.[14]  As set forth in HESI's Memorandum in Support of Its Motion to Dismiss, the Deepwater Horizon was neither an artificial island nor a fixed structure.  It was a vessel.[15]  Therefore, § 1333(a)(2)(A) does not apply "adjacent state law" in this case.[16]

---

[14] It is not surprising that the scope of §§ 1333(a)(1) and 1333(a)(2)(A) should be different.  The very broad exertion of federal authority under § 1333(a)(1) necessarily encompasses all mineral exploration and production activities on the Outer Continental Shelf, whether performed by "fixed platforms" or "vessels," in order to maximize federal control over vital national resources.  However, maritime law has historically governed claims arising on or in connection to a vessel, *see Sisson,* 497 U.S. at 360-61, and so § 1333(a)(2)(A)'s application of adjacent state law is only needed to fill the gap where claims arise on or in connection with a *non-vessel—i.e.*, an artificial island or fixed structure—such as a fixed platform.  Consequently, claims arising out of mineral exploration on the Outer Continental Shelf may broadly arise under OCSLA, but such claims may be governed either by maritime law (as in this case) or, to the extent they fall within § 1333(a)(2)(A)'s narrower "adjacent state law" provision (applicable to non-vessels), by state law as a proxy for federal law.

[15] *See* HESI's Memorandum in Support of Its Motion to Dismiss at 7-8.

[16] Even if § 1333(a)(2)(A) were to apply in this case, Louisiana law likely would apply as adjacent state law, not Alabama law.  In *Snyder Oil Corp. v. Samedan Oil Corp.,* the court considered four kinds of evidence to determine which state was considered "adjacent" to an OCSLA situs:  (1) geographic proximity; (2) which coast federal agencies consider the subject platform to be "off of"; (3) prior court determinations; and (4) projected boundaries.

**C.     The Oil Pollution Act of 1990 ("OPA") is Plaintiffs' Exclusive Remedy for the Damages They Allege.**

Because Plaintiffs' claims are governed by maritime law, they are displaced by OPA. Plaintiffs argue that OPA does not preempt their maritime claims and cite to OPA's "Savings Provision," 33 U.S.C. § 2751, in support. However, Plaintiffs' superficial gloss is unavailing and ignores the express language in the first phrase of this statutory provision.

Section 2751 provides:

> ***Except as otherwise provided in this Act***, this Act does not affect – (1) admiralty and maritime law; or (2) the jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction, saving to suitors all other remedies to which they are otherwise entitled.

33 U.S.C. § 2751(e) (emphasis added). Plaintiffs read the "Savings Provision" as if the first phrase does not exist.

In doing so, Plaintiffs fall into the trap recognized by the court in *Gabarick v. Laurin Maritime (America), Inc.*, 623 F. Supp. 2d 741 (E.D. La. 2009). In *Gabarick*, the court held that "all claims that are recoverable under OPA, specifically those covered damages enumerated in 33 U.S.C. § 2702, are preempted by OPA." *Id.* at 750-51. Addressing the issue of OPA preemption of maritime claims, the court noted that "[c]laimants[] ignore[] the first part of *section (e)* . . . [and] cloud the issue at bar by arguing that OPA does not preempt general

---

208 F.3d 521, 524 (5th Cir. 2000). Louisiana is closer to the situs of the Deepwater Horizon incident than any other state, including Alabama, and the Minerals Management Service (MMS) (n/k/a Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE)) has described the Deepwater Horizon incident as occurring "50 miles offshore Louisiana" on its official website linking a webpage describing the Deepwater Horizon incident, http://www.mms.gov/DeepwaterHorizon.htm, a copy of which is attached hereto as Exhibit 1. Similarly, in a notice entitled "Information to Lessees and Operators on Federal Oil and Gas Leases on the Outer Continental Shelf, Gulf Mexico Region," dated April 28, 2010, MMS notified lessees and operators in the Gulf of Mexico about its intention to initiate controlled burns to abate the oil spill and described the oil spill as being "located offshore Louisiana." *See* https://www.gomr.mms.gov/homepg/regulate/regs/itls/100428.pdf, a copy of which is attached hereto as Exhibit 2. In addition, federal district courts have noted that other locations in the Mississippi Canyon are adjacent to the State of Louisiana and have applied Louisiana law as surrogate federal law. *See, e.g., Ronquille v. MMR Offshore Svcs, Inc.*, 353 F. Supp. 2d 680, 682 n.4 (E.D. La. 2004); *Dennis v. Bud's Boat Rental, Inc.*, 987 F. Supp. 948, 949-954 (E.D. La. 1997). Therefore, even if OCSLA were to apply adjacent state law in this case, it likely would apply Louisiana, not Alabama law.

maritime law claims rather than focusing on preemption solely of the damages specifically covered by OPA." *Id.* at 746. Plaintiffs attempt to similarly cloud the issues here. As the court in *Gabarick* explained, consistent with the text of the savings clause, OPA does not preempt all general maritime claims. Rather, it preempts those maritime claims *seeking damages of the type recoverable under OPA.* *Id.* at 746-47.[17] Thus, the savings provision, properly interpreted, provides that OPA does not affect admiralty and maritime law, *except* with respect to claims for damages of the types recoverable under OPA. *Id.* at 746.

In this case, Plaintiffs allege generally damage to property values, "earning capacity" and "business income" due to the oil spill. (Complaint ¶ 2). Such damages are recoverable under 33 U.S.C. § 2702(b) of OPA[18] and, therefore, Plaintiffs' maritime claims seeking such damages are preempted.

Plaintiffs' assertion that they are entitled to punitive damages also fails. Punitive damages are not a separate cause of action. *Sulzer Carbomedics v. Or. Cardio-Devices, Inc.*, 257 F.3d 449, 461 (5th Cir. 2001); *see also Byrne v. Nezhat*, 261 F.3d 1075, 1087 (11th Cir. 2001) (noting that plaintiff's claim for punitive damages was not a separate cause of action). Instead, they "must relate to some separate cause of action which permits recovery of punitive damages." *South Port Marine, LLC, v. Gulf Oil Ltd. P'ship.*, 234 F.3d 58, 64 (1st Cir. 2000). As OPA provides Plaintiffs' exclusive remedy, their damages are limited to those provided for in the statute.

---

[17] Thus, for example, as OPA does not cover bodily injury claims or collision damage, or Exoneration/Limitation Petitions, the savings provision operates to preserve such maritime claims, and OPA does not preempt them. *Gabarick*, 623 F. Supp. at 745. *See also Tanguis v. M/V WESTCHESTER*, 153 F. Supp. 2d 859, 867 (E.D. La. 2001) (noting that "certain maritime remedies are preempted by OPA, while others survive"). Plaintiffs do not dispute that *Gabarick* held that OPA preempts some maritime claims. (Opposition at 10).

[18] Plaintiffs acknowledge that their damages are the kinds of damages provided for in OPA. (Opposition at 6).

OPA does not provide for the recovery of punitive damages. *South Port Marine*, 234 F.3d. at 65-66; *see also Clausen v. M/V New Carissa*, 171 F. Supp. 2d 1127, 1134 (D. Ore. 2001). Moreover, Plaintiffs' reliance on *Exxon Shipping Co. v. Baker*, __ U.S. __, 128 S. Ct. 2605 (2008), is misplaced because *Baker* dealt with the Clean Water Act as it existed at the time the Exxon-Valdez lawsuit was filed, not with OPA, which was enacted after the Exxon-Valdez oil spill. The First Circuit in *South Port Marine*, which, by contrast, dealt specifically with the issue of the availability of punitive damages under OPA, held that punitive damages are not recoverable under the new Congressionally-enacted scheme applicable to oil spills.

**D.    *Robins Dry Dock* and the Economic Loss Rule Bar Plaintiffs' Claims**

OPA may provide a basis for Plaintiffs' recovery from a "responsible party" for legitimate economic damages caused by the oil spill. However, Plaintiffs' Opposition does nothing to refute that the "economic loss rule" applies to preclude their recovery of such damages under maritime law.

Plaintiffs cite no authority, and HESI cannot locate any authority, for the proposition that § 9607(h) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601, *et seq.*, abrogates the economic loss rule announced in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 309 (1927). Even if such authority exists, it does not apply to HESI. Plaintiffs allege no CERCLA claim(s) against HESI or any defendant, so the statute is irrelevant to this case. Even if Plaintiffs were to bring CERCLA claims, the plain text of § 9607(h) purports to apply only to "[t]he owner or operator of a vessel." 42 U.S.C. § 9607(h) ("***The owner or operator of a vessel*** shall be liable in accordance with this section . . .

.") (emphasis added).  HESI was neither the "owner" nor the "operator" of the Deepwater Horizon, as Plaintiffs concede.[19]

Plaintiffs' reliance on *Miller Indus. v. Caterpillar Tractor*, 733 F.2d 813 (1984), is also misplaced.  In that case, the Eleventh Circuit considered whether a negligent failure to warn of a defect in a fishing boat engine formed the basis for a negligence action under maritime tort law, even though the only physical damage that occurred as a result of the defect was to the engine itself.  733 F.2d at 818.  Before deciding to allow the claim, the court specifically noted that "our holding is confined to the facts presented by this case."  *Id*. at 815.  Thus, any reliance on *Miller* for an expansion of the commercial fisherman exception is futile.  More importantly, *Miller*'s holding has been abrogated, if not explicitly overruled, by the Supreme Court.  *See East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 871 (1986) (noting that "[w]hen a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong"); *see also Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GMBH*, 524 F.3d 676, 679 n.2 (5th Cir. 2008) (noting that "*Miller* is also seemingly no longer good law" as a result of *East River*).[20]

Thus, even if OPA does not displace Plaintiffs' maritime claims, which it does, the economic loss rule would preclude them.

## E.     The Complaint Fails to Meet Rule 8's Applicable Pleading Requirements.

Plaintiffs contend that their allegations against Defendants satisfy the requirements of Rule 8 and attempt to minimize the import of the United States Supreme Court's recent

---

[19] Complaint ¶ 11 (alleging that the BP Defendants "manned, possessed, managed, controlled, chartered, and/or operated the Deepwater Horizon").

[20] Plaintiffs contend that the economic loss rule "may not apply where intentional conduct caused the damages." (Opposition at 19).  However, Plaintiffs have not alleged any intentional conduct by HESI or any other defendant. So, Plaintiffs' contention should be disregarded.

clarifications of that rule in *Twombly*[21] *and Iqbal*.[22]   However, as the Supreme Court acknowledged in *Iqbal,* the *Twombly* holding represented a real change in the Supreme Court's application of Rule 8.   *See Iqbal,* 129 S. Ct. at 1944 (noting that "*Twombly* retired the *Conley* no-set-of-facts test").   As set forth in HESI's Memorandum in Support of its Motion to Dismiss, Plaintiffs' claims should be dismissed based on their conclusory nature and lack of factual enhancement.

The Complaint contains a lengthy list of alleged acts and/or omissions in support of Plaintiffs' claims,[23] but Plaintiffs fail to ascribe these acts/omissions to any specific defendant(s), providing another reason why their claims require dismissal.   *See Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) ("The complaint is a quintessential 'shotgun' pleading. . . . [It] is replete with allegations that 'the defendants' engaged in certain conduct, making no distinction among the fourteen defendants charged"); *Lane v. Capital Acquisitions and Management Co.,* No. 04-60602 CIV, 2006 LEXIS 96422, at *16 (S.D. Fla. Apr. 14, 2006) (finding that a complaint that lumps all the defendants together in each claim and provides no factual basis to distinguish their conduct falls short of the requirements of Rule 8).

Like the complaints in *Magluta* and *Lane,* the present Complaint requires HESI to guess which of Plaintiffs' conclusory allegations is asserted against it.   Rule 8, as interpreted by the Supreme Court, exacts more precise notice and pleading standards.   Plaintiffs fail to meet them here, and their claims should be dismissed.

---

[21] *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007).

[22] *Ashcroft v. Iqbal,* ___ U.S. ___, 129 S. Ct. 1937 (2009).

[23] *See, e.g.*, Complaint ¶ 30(a)-(r).

### III.    CONCLUSION

For the reasons set forth above and in HESI's Memorandum in Support of Its Motion to Dismiss, Plaintiffs' claims should be dismissed as a matter of law pursuant to Rule 12(b)(1) and Rule 12(b)(6).  Alternatively, Plaintiffs should be required to file a more definitive statement of their pleading pursuant to Rule 12(e).

Respectfully submitted this 12th day of August, 2010.

**GODWIN RONQUILLO PC**

DONALD E. GODWIN (GODWD5022) *(pro hac vice)*
Email  dgodwin@godwinronquillo.com
BRUCE W. BOWMAN, JR. *(pro hac vice)*
Email  bbowman@godwinronquillo.com
JENNY L. MARTINEZ *(pro hac vice)*
Email  jmartinez@godwinronquillo.com
FLOYD R. HARTLEY, JR. *(pro hac vice)*
Email  fhartley@godwinronquillo.com
GAVIN E. HILL *(pro hac vice)*
Email  ghill@godwinronquillo.com
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
Telephone: 214.939.4400
Facsimile: 214.760.7332

and

R. ALAN YORK *(pro hac vice)*
Email  ayork@godwinronquillo.com
1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

and

**s/ Joseph P. H. Babington**
JOHN N. LEACH  (LEACJ2634)
Email  jnl@helmsinglaw.com
JOSEPH P. H. BABINGTON  (BABIJ7938)
Email  jpb@helmsinglaw.com
RUSSELL C. BUFFKIN  (BUFFR6510)
Email  rcb@helmsinglaw.com
**HELMSING, LEACH, HERLONG, NEWMAN
& ROUSE, P.C.**
Post Office Box 2767
Mobile AL 36652
Telephone:  251.432.5521
Facsimile:  251.432.0633

**ATTORNEYS FOR DEFENDANT,
HALLIBURTON ENERGY SERVICES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 12th day of August, 2010, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the court's electronic filing system. I also certify that I have mailed this filing by United States Postal Service to all counsel of record who are not registered to receive electronic service by operation of the court's electronic filing system.

Jere L. Beasley, Esquire
Rhon E. Jones, Esquire
David B. Byrne, III, Esquire
John E. Tomlinson, Esquire
J. Parker Miller, Esquire
BEASLEY, ALLEN, CROW, METHVIN, PORTIS
    & MILES, PC
218 Commerce Street
Post Office Box 4160
Montgomery, AL 36103-4160
*Counsel for Plaintiffs*

John M. Johnson, Esquire
Adam K. Peck, Esquire
William H. Brooks, Esquire
Marchello D. Gray, Esquire
LIGHTFOOT, FRANKLIN & WHITE, LLC
400 North 20th Street
Birmingham, AL 35203
*Counsel for BP America, Inc., BP plc,
and BP Products North America, Inc.*

Christopher D. Boutwell, Esquire
BEASLEY, ALLEN, CROW, METHVIN, PORTIS
    & MILES, PC
415 East Commerce Street, Suite 215
Greenville, AL 36037
*Counsel for Plaintiffs*

Richard C. Godfrey, Esquire
John T. Hickey, Jr., Esquire
James Andrew Langan, Esquire
KIRKLAND & ELLIS, LLP
300 N. LaSalle
Chicago, IL 60654
*Counsel for BP America, Inc., BP plc,
and BP Products North America, Inc.*

A. Danner Frazer, Jr., Esquire
Ross A. Frazer, Esquire
Robert J. Mullican, Esquire
FRAZER GREENE UPCHURCH & BAKER
Post Office Box 1686
Mobile, AL  36633
*Counsel for Cameron International Corp.*

Randal H. Sellers, Esquire
M. Warren Butler, Esquire
Bryan G. Hale, Esquire
STARNES DAVIS FLORIE
100 Brookwood Place, 7th Floor
Birmingham, AL 35209
*Counsel for Cameron International Corp.*

David J. Beck, Esquire
BECK, REDDEN & SECRET, LLP
One Houston Center
1221 McKinney Street, Suite 4500
Houston, TX 77010
*Counsel for Cameron International Corp.*

s/ Joseph P. H. Babington
Of counsel